FRANKLIN ARTHUR WRIGHT, PLAINTIFF IN ERROR, V. STATE OF NEBRASKA, DEFENDANT IN ERROR.

100 N. W. 2d 51

Filed December 24, 1959. No. 34636.

*John N. Baldwin* and *Thomas P. Lott,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Richard H. Williams,* for defendant in error.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

The plaintiff in error, referred to herein as the accused, was charged with and convicted of the crime of murder in the second degree. He was adjudged to be confined in the Nebraska State Penitentiary for a definite term. He prosecutes error to review the record of his conviction.

The record establishes that the accused in his place of business, the Pastime Cafe at 604 North Sixteenth Street in the city of Omaha, Douglas County, Nebraska, at about 11 o'clock on the evening of January 20, 1958, stabbed Robert Lattery, hereafter described as Lattery, in the abdomen with a knife from which injury he died a few hours thereafter. An eyewitness to the affair testified that the accused, holding a knife in front of him, approached Lattery and struck him in the stomach with the knife. A second eyewitness said on the trial that he saw the accused with a knife in his hand come to the center of the building where Lattery was, they

met, there was a considerable noise, and Lattery walked towards the outside of the place of business in a bent-over position. The accused was interrogated by a city detective about 30 minutes after the assault on Lattery and the accused then admitted he had stabbed Lattery. The detective testified that the accused told him that he picked up a knife from a vegetable table or salad board, met Lattery halfway, and when he reached out and put a hand on the shoulder of accused he stabbed Lattery in the stomach. The accused in a statement made by him and taken by a court reporter about 2 hours after the tragedy said he had a small paring knife used in his business in his hand when he went to meet Lattery in the place of business of the accused that night. Lattery was coming toward the accused and as they converged upon one another the accused struck Lattery in the stomach with the knife. In the cross-examination of the accused at the trial he fixed the time when he told Lattery to leave the Pastime Cafe as before the time the accused stabbed Lattery with a knife.

A policeman of the city saw Lattery about 11:15 p. m. that night as he came stumbling outward through the door of the Pastime Bar which was adjacent to but separate from the Pastime Cafe. He told the policeman that he had been stabbed and then fell unconscious on the cement. He was taken by ambulance to the County Hospital. He died there at 2:35 a. m., January 21, 1958. The undisputed evidence is that the cause of his death was hemorrhagic shock produced by acute loss of blood resulting from the penetrating wound of the abdomen inflicted upon him.

It is definite that the accused purposely assaulted and wounded Lattery at the time and place above stated and that the injury inflicted on him was the cause of his death. However, the accused argues that malice was an essential element of the crime charged; that the burden was on the State to prove its existence beyond a reasonable doubt; that the evidence was not sufficient to

sustain a finding of malice; and that it was reversible error for the trial court to submit to the jury the charge of second-degree murder.

The prosecution was based upon section 28-402, R. R. S. 1943, which in part declares: "Whoever shall purposely and maliciously, but without deliberation and premeditation, kill another, every such person shall be deemed guilty of murder in the second degree * * *." Malice is thereby made an essential element of the crime charged. Vanderheiden v. State, 156 Neb. 735, 57 N. W. 2d 761. If the circumstances attending the homicide are in evidence by a witness or witnesses thereto, there is no presumption of malice from the fact of the killing. Tvrz v. State, 154 Neb. 641, 48 N. W. 2d 761; Woodard v. State, 159 Neb. 603, 68 N. W. 2d 166. The facts of the tragedy in this instance were explored and presented by examination at the trial of persons who were present and witnessed it. Therefore it must be shown by evidence beyond a reasonable doubt that the wrongful act attributed to the accused was maliciously done. Childs v. State, 120 Neb. 310, 232 N. W. 575.

This court may not in a case of this character decide conflicts in or weigh the evidence or pass on the credibility of witnesses. Hertz v. State, 160 Neb. 640, 71 N. W. 2d 113. It is implicit in a verdict of guilty in such a case that the jury resolved all controverted questions of fact unfavorably to the accused and this court will not disturb such a verdict, based on evidence, unless as a matter of law it is insufficient to support a finding of guilty beyond a reasonable doubt. Hertz v. State, *supra.* In a case of the character of the present one the unlawful killing is the principal fact but the condition of the mind or the attendant circumstances determine the class of the crime as second-degree murder or manslaughter. If the evidence in reference thereto is such that various inferences may properly be deduced therefrom as to the degree of the crime, the trial court must submit the different degrees to the jury to determine

which inference shall prevail. Vanderheiden v. State, *supra.* The trial court in this case by instructions, the correctness of which has not been contested, submitted both second-degree murder and manslaughter to the jury and it determined that the crime committed by the accused was murder in the second degree. The problem because of the challenge tendered by the accused is whether the wrongful act which caused the death of Lattery was maliciously done or, stated differently, was the accused actuated by a desire and purpose to kill the deceased unlawfully. Lucas v. State, 78 Neb. 454, 111 N. W. 145.

The record contains evidence of this character: A customer sitting at the counter near the front of the cafe the evening of the occurrence, the subject of this controversy, stated there were two ladies waiting near the cash register obviously to pay their bills for service they had in the cafe. A man, later identified as Lattery, was sitting on a stool next to the witness. Lattery addressed the persons operating the cafe in substance that they should take care of and wait on their trade. Accused approached Lattery from back of the counter and said that they would take care of that as rapidly as they could and that he was not needed to run the business. Lattery stood up and said to the accused: " 'You are going to give me a bad time,' " and he started towards accused who backed away towards the back part of the room. It was said by another witness who, as a customer, was near the back part of the cafe and had given his order that evening, that he thought he heard in the front of the cafe scuffling, profanity, and argument as though there was going to be a fight. The persons involved were the accused and Lattery. The former was behind the counter and the latter was in front of it. There was much loud talking and profanity and it seemed that each of the two men had threatened the life of the other. They both got in front of the counter. Lattery was the larger man and he grabbed the ac-

cused by the collar. Accused left and went to the back part of the building. It looked like he was being run out of his own place of business. Lattery was near the center of the room mumbling to himself and he said: " 'Why don't you call the Law?' " The witness saw accused go towards the front of the cafe with a knife in his hand. He met Lattery near the center of the building and Lattery walked away from the accused limping or bent over. He was later assisted from the building. It was said by a witness who was also a customer in the cafe at about 11 p. m. that night that he heard loud talking up front. He saw Lattery and accused across the counter from each other. He heard Lattery ask the accused: " 'Why don't you do something about it?' " The accused said: " 'Well, I think I will.' " Accused left and went to the rear of the building, got a knife, and started toward Lattery who then said: " 'You don't need to call the Police. * * * I will get out.' " The accused with the knife in front of him went to Lattery and struck him in the stomach with the knife. He folded forward, put his hands in front of him, and said: " 'You didn't need to do that.' " The accused walked toward, to, and struck Lattery. He was doing nothing but just standing near the center of the room. An employee of the cafe and the accused turned Lattery around, opened the front door, and pushed him outside. They closed the door and the accused said: " 'Well, I guess I fixed him.' " The witness said he did not see Lattery at any time make any threatening motions or moves toward the accused. The accused told a police officer that he did not think his personal safety was in jeopardy at the time the accused stabbed Lattery but the accused said the reason he did was because he was angry at the foul language applied to him. The accused told the police officer that Lattery did not at any time strike or attempt to strike the accused. In the statement taken by the court reporter soon after the tragedy occurred the accused said that when Lattery

started out (meaning out of the cafe when accused went for the knife), that was when accused made his mistake: "I should have just kept going on the other way."

The accused gave Lattery no aid after he was fatally injured. Accused returned from ejecting his victim into the street in the night in his seriously disabled condition with the words of triumph: " 'Well, I guess I fixed him,' " and he immediately went to his bed for a night of rest. That is where the police found him.

The presence of Lattery in the cafe was not as a customer. He sought no service there. His purpose apparently was that of a disturber and a tormentor. There is some proof that he was brazenly insulting and was a foul defamer by the employment of profane and indecent language accompanied by threats of violence. However, language alone, though extremely abusive or indecent, is no justification for doing violence to the person of another. Braunie v. State, 105 Neb. 355, 180 N. W. 567, 12 A. L. R. 658; 26 Am. Jur., Homicide, § 29, p. 175. Lattery had no weapon or object that could have done anyone harm. He attempted no actual violence. There was not the slightest basis for a claim of self-defense by accused as a justification for his having mortally wounded Lattery. It is true that the evidence is somewhat conflicting but the credibility of the witnesses and the weight of the evidence were for the jury to determine and this court may not intervene to disturb the conclusion of the jury unless it is clearly wrong. Griffith v. State, 157 Neb. 448, 59 N. W. 2d 701. It may not be said that the verdict of the jury was clearly wrong in this case. The court was correct in submitting to the jury the issue of whether or not the accused was guilty of second-degree murder and the evidence sustains the verdict.

The accused asserts that the trial court prejudiced the jury against him by an instruction which was to the effect that there had been evidence that Lattery used vile and foul language directed toward the ac-

cused immediately before the stabbing; and that even though the jury should find that such language was used and that it angered and provoked the accused, the use of the language would not justify accused in committing an unlawful act toward Lattery. The instruction also said: "If you find that said language provoked or angered Defendant to the extent that Defendant committed an unlawful act directed towards ROBERT LATTERY * * * and that same resulted in the death of ROBERT LATTERY, * * * then you should find the Defendant guilty provided the State has proven said facts by evidence beyond a reasonable doubt." The specific objection of accused to the instruction is that thereby the trial court told the jury that even though the stabbing occurred in a sudden quarrel provoked by vile and foul language of Lattery, it should find the accused guilty of second-degree murder. Such is not a correct interpretation of the instruction. The words "second-degree murder" are not contained in the instruction. The instruction did not say the jury could convict accused because of the bad language of Lattery but that it could do so notwithstanding it if the essential facts delineated were proved by evidence beyond a reasonable doubt. The trial court by appropriate instruction assigned to the jury the duty of deciding whether accused was guilty of second-degree murder or manslaughter or neither. The instruction complained of is understandable when it is considered with the other parts of the charge to the jury. It advised the jury that the use of vile and foul language by Lattery in reference to the accused did not justify him in committing an unlawful act toward Lattery; and that if such language caused the accused to commit an unlawful act toward Lattery which resulted in his death, then the jury should find the accused guilty (of either second-degree murder or manslaughter), providing the State had proven said facts by evidence beyond a reasonable doubt. Instructions should be considered together in

order that they may be properly understood; and when as an entire charge they properly submit the issues to the jury, the verdict will not be set aside. Bezdek v. Patrick, 164 Neb. 398, 82 N. W. 2d 583. The complaint of accused in this respect is not well taken.

The judgment and sentence should be and they are affirmed.

AFFIRMED.