AMOS CLOWN HORSE, PLAINTIFF IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

102 N. W. 2d 625

Filed April 22, 1960. No. 34757.

*Willis A. Herman* and *Donald L. Wood,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Bernard L. Packett,* for defendant in error.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

The plaintiff in error, herein designated accused, was charged with the crime of murder in the second degree, was convicted of the crime of manslaughter, and was adjudged to be confined in the Nebraska State Penitentiary for a definite term. He prosecutes this error proceeding to review the record of his conviction.

The accused and Sarah Bad Heart, also named Sarah Bad Heart Bull and referred to herein as Sarah, were employed by and worked for a farmer northeast of Minatare and they with the five children of Sarah, the oldest of whom was 10 years and the youngest 6 months, lived in a labor house which was secured by the accused. He was not related to Sarah or any of her children. She and her husband were estranged and at the times important to this case he was confined in jail at Scottsbluff.

The accused and Sarah went to Scottsbluff on July 29, 1959. Accused stopped at a pool hall and Sarah did some shopping after which she went to Earl's Pool Hall, met the accused, and they drank beer. They then repaired to the Daily Double Bar and drank more beer. From there they traveled to Gering, arriving there about noon of that day. They visited the Union Bar in Gering and drank beer. They were joined there by Lila Orr Hamburger, hereafter spoken of as Mrs. Hamburger or the deceased, who brought the beer she was drinking with her and sat down and visited with the accused and Sarah. Mrs. Hamburger consented to take Sarah and the accused in her automobile to the home of the parents of accused on a farm west of Gering but before they started on that trip they secured two six-packs of beer and the three of them drank it while on that trip. They stayed at the farm where the parents of accused lived for quite a while and then returned to Gering and stopped at the Safeway Store where Sarah did some more shopping. Mrs. Hamburger wanted more beer and they went to Terry's in Terrytown between Gering and Scottsbluff and bought two six-packs of beer. It was then probably 3 or 4 o'clock in the afternoon. They then proceeded to the home of Mrs. Hamburger on the southeast corner of L and Twelfth Streets, known as 1115 L Street, in Gering to drink the beer they had recently purchased after which Mrs. Hamburger was going to take accused and Sarah to their home near Minatare. They sat in the home, conversed, and drank beer. Mrs. Hamburger produced a bottle of wine and she and accused drank it. They ate sandwiches prepared by her and thereafter accused wanted Sarah to go home with him because her five children had been left at home alone. She wanted to stay with Mrs. Hamburger who said she would bring Sarah home later in the evening. Accused insisted that Sarah go home with him and she refused. Accused became angry and he slapped Sarah. Mrs. Hamburger swore at

accused and told him not to slap Sarah again. Accused took Sarah by both arms in an attempt to have her go home with him to the children who had been alone in the home since before noon. Accused and Sarah were fighting and scuffling in the living room of the Hamburger home. Accused slapped Sarah a second time and thereupon Mrs. Hamburger stabbed accused in the back with a butcher knife. It was then about 8 o'clock in the evening.

The wound inflicted on accused by the stabbing was on the right upper posterior chest, that is, the back of the chest. It was deep enough that it communicated with the chest cavity. The knife struck a rib, traveled obliquely downward between two ribs, entered the chest cavity, and caused lung damage. The wound was probed with a rubber catheter and about 8 inches of it extended into the chest cavity. When a doctor saw accused a brief time later he was suffering severe pain, difficulty in breathing, and shock.

A specimen of blood was secured later that evening from accused and from the body of Mrs. Hamburger. The blood alcohol content from accused was determined to be 0.31 or 310 milligrams percent, and the blood alcohol content of the specimen from the body of Mrs. Hamburger was determined to be 0.15 or 150 milligrams percent. The result of each of these determinations was indicative of alcoholic intoxication. The record is convincing that accused, Mrs. Hamburger, and Sarah were each intoxicated when they went to the Hamburger home and thereafter until the two first named were placed in the hospital and Sarah was confined in jail.

Sarah did not see the knife with which accused was stabbed and she did not know that Mrs. Hamburger had it until after the accused was stabbed in the back by Mrs. Hamburger. She did not know who took the knife out of the body of accused. There is undisputed evidence of two doctors that accused could not have taken it from his body. Soon thereafter accused had

the knife in his hand and that is when Sarah first saw it. She grabbed for it, the knife was jerked away, and that is how her left hand was cut. Accused turned his body and she saw blood on his back from the wound caused by the stabbing of him. When accused turned around he slapped or hit Mrs. Hamburger and she fell or sat down in a big chair or on a couch. Sarah heard the accused say he was stabbed or something like that and to call the cops. She ran from the house and down the road until she met an automobile which stopped. The record is not clear what she told the operator of the automobile but it indicates she made it known to him that something serious had happened at the Hamburger home. Sarah came to the automobile of Mrs. Hamburger which was parked in the street in front of the Hamburger house and accused was then standing by it. He was all bloody. She attempted to take hold of him but he did not want to be touched. He told her to get away. He got into the front seat of the automobile and lay on his back. She got in the back seat and tried to talk to him but she could get no response. He gave evidence of suffering pain and appeared to be quite unconscious. She did not go back into the Hamburger house. The sheriff came to the automobile soon afterwards and put a bandage on her bleeding hand. He asked her what had happened and she told him that Mrs. Hamburger stabbed accused and then he stabbed Mrs. Hamburger. When accused was on the sidewalk near the automobile he told Sarah that he stabbed Mrs. Hamburger. There had been no ill feeling, disagreement, or difficulty between either the accused or Sarah and Mrs. Hamburger before the occurrences of the evening of that day which are involved in this case. All of their relations had been cordial and pleasant.

Two police officers came to the Hamburger home soon after Sarah got into the automobile parked in the street. She told the officers that a woman in the house had been stabbed. The officers entered the house and found

Mrs. Hamburger on the floor with a butcher knife inserted in her abdomen. The entire blade of the knife except about the last inch thereof next to the handle was buried in her body. The police officers called the sheriff and then they went for a doctor. The doctor was brought to the scene of the tragedy and he with the sheriff entered the house. They found Mrs. Hamburger on the floor with her left arm lying back of her and her legs drawn up. The doctor examined her. She was living but her respirations were very stertorous and she had no pulse or blood pressure. There was a knife in her left upper abdomen and she was covered with blood. The doctor administered an injection of adrenalin, removed the knife from her body, and told the sheriff and police officers to get her to the hospital at once. She was placed in an ambulance and taken to the hospital. She was dead when the ambulance arrived there. There were multiple bruises and minor lacerations about her head and face. They were especially on the right side of her face and involved the nose, the tissue about the right eye, right cheek bone, the right ear, and the area immediately behind the ear involving the bony prominence that is referred to as the mastoid area, and a stab wound in the body. The right side of her upper lip was bruised and had a laceration. Her mouth contained a broken dental plate and was partly filled with blood. Her left arm was broken at the junction of the upper third and the middle third of the humerus. The stab in her body was in the right hypochondrian, that is, it was just to the left of the midline and at the level of the sixth costal cartilage that joins the rib to the breastbone. The wound was straight into the body and extended into the attachment of the diaphragm to the rib cage, the left lobe of the liver, the ligament that suspends the stomach, into the peritoneal area, the tissues in the back part of the abdominal cavity, and through the aorta, both the front and back walls of it. The aorta

is that main branch from the heart which conducts blood to all parts of the body except the lungs.

The cause of the death of Mrs. Hamburger was hemorrhage of the stab wound of the aorta, most of which occurred into the abdominal cavity but there was a considerable amount of blood that leaked through the abdominal skin wall. The immediate cause of her death was a direct result of the stab wound made in her body.

The accused, Sarah, and deceased went to and entered the home of the latter on the afternoon of July 29, 1959, and they were the only persons there until Sarah left after the accused was stabbed by deceased. Thereafter she and accused were the only persons in the house until the police officers entered and found deceased with the knife thrust into her abdomen which caused the wound resulting in her death. Those three persons were the only ones at or near the house when the officers arrived there that evening. There was no mention in the record of any other person being at or near the house during that time or that anyone except these three persons had any part in the tragic events of that afternoon and evening. The deceased was a small person. Her height was 5½ feet and her weight was about 105 pounds. The accused was at least 6 feet tall, weighed about 205 pounds, was 27 years of age, able-bodied, athletic, and a trained fighter in the heavyweight class who had experienced fighting in the ring.

The accused in his version of the affray admitted that he was attempting to get Sarah to go with him from the Hamburger home because it was approaching night and the children of Sarah had been told that their mother and the accused would be home before dark that evening; that he slapped Sarah, how many times he did not remember; that he had her by one arm; and that they were resisting each other. It was at that time that accused was hit from behind with the knife and was stabbed by deceased. He quickly turned around. He struck deceased and he then saw for the first time

that she had a knife in her right hand. He grabbed her arm and they wrestled. He was attempting to take the knife from her. He said he thought she was going to use it again. He did not get the knife away from her and asserts he never did have it in his hand. He said at no time did he have the knife in either of his hands. He was experiencing trouble in breathing and was trying to get some air. He moved toward the door, opened it, fell down once or twice but finally got to the automobile parked in front of the house, and that was the last he remembered until the next morning in the hospital. He said when he saw the knife in the hand of deceased he for the first time realized that he had been stabbed. He said he had no reason, intention, or desire to do the deceased any injury and had no knowledge that he did so. He did remember that as he was struggling for breath and trying to get out of the house he saw her lying there in the room.

Sarah testified at the trial she did not remember that accused told her he stabbed deceased, and Sarah said she did not remember she told the sheriff accused had told her that he stabbed deceased. This record is adorned with inconsistent and contradictory statements but it was for the jury to say which were true and from the circumstances presented to it at the trial to determine the facts.

This court may not in a case of this kind decide conflicts in or weigh the evidence or pass on the credibility of witnesses. It is implicit in a verdict of guilty that the jury resolved all controverted questions of fact in favor of the State and this court will not disturb such a verdict based on evidence unless, as a matter of law, it is insufficient to support a finding of guilt beyond a reasonable doubt. Hertz v. State, 160 Neb. 640, 71 N. W. 2d 113; Wright v. State, 169 Neb. 497, 100 N. W. 2d 51.

This prosecution was based on section 28-402, R. R. S. 1943, which in part declares: "Whoever shall pur-

posely and maliciously, but without deliberation and premeditation, kill another, every such person shall be deemed guilty of murder in the second degree * * *." Malice and a purpose to kill are thereby made essential elements of the crime charged. Vanderheiden v. State, 156 Neb. 735, 57 N. W. 2d 761; Wright v. State, *supra.*

The relevant language of section 28-403, R. R. S. 1943, is: "Whoever shall unlawfully kill another without malice, either upon a sudden quarrel, or unintentionally, while the slayer is in the commission of some unlawful act, shall be deemed guilty of manslaughter * * *."

If an information charges the crime of murder in the second degree, the crime of manslaughter is included in the charge. In a case of the character of the present one the unlawful killing is the principal fact but the condition of the mind or the attendant circumstances determine the class or grade of the crime as second-degree murder or manslaughter. If the evidence in reference thereto is such that various inferences may properly be deduced therefrom as to the degree of the crime, the trial court must submit the different degrees to the jury to determine which inference shall prevail. Vanderheiden v. State, *supra;* Wright v. State, *supra;* Woodard v. State, 159 Neb. 603, 68 N. W. 2d 166. It is, of course, the duty of the district court to instruct the jury only on such degree or degrees of homicide as are supported by evidence sufficient to sustain a verdict of guilty. Woodard v. State, *supra.*

The accused complains that it was prejudicial error for the district court to instruct the jury as a part of its charge on the subject or element of intent, as follows: "Every sane person is presumed to intend the natural and probable consequences of his voluntary acts." It is said by the accused that this relieved the State of its burden of proving the element of malice beyond a rea-

sonable doubt and this is correct. It is also said by accused that the part of the instruction quoted above operated to prejudice defendant in his right to a fair and impartial trial. It cannot be conceded that this is a correct conclusion. It assumes, as the brief of accused asserts, that when the homicide is fully testified to by witnesses in a case in which second-degree murder is charged, the State to make a case must prove beyond a reasonable doubt that the homicidal act was done feloniously with the intent and purpose to kill.

In the present case the circumstances attending the homicide were not fully testified to by an eyewitness. The accused did not attempt to testify fully as to what took place in the Hamburger house after Sarah left upon his instructions to get the police shortly after he had been stabbed by deceased and before she was beaten, bruised, lacerated, her left arm bone fractured, and a fatal wound inflicted upon her by being stabbed with a sizable knife near enough to her heart to make an opening in a principal artery of her body. Sarah was not in the Hamburger house when any of the things referred to immediately above happened to deceased. Sarah was out of the house looking for the police when the wound was inflicted upon the body of deceased which was the cause of her death. There was no eyewitness to the killing of deceased who could or did testify to the circumstances thereof upon the trial of this case. The contention in this regard made by the accused is not new. It was announced in the decision of a similar contention in Vollmer v. State, 24 Neb. 838, 40 N. W. 420, that on a trial for murder in the second degree malice can be implied if the killing alone is shown; but if all the circumstances connected with the killing were shown by an eyewitness, then malice in such a case was a question of fact for the consideration and determination of the jury. This doctrine has since

been consistently adhered to in many subsequent decisions of this court.

Lucas v. State, 78 Neb. 454, 111 N. W. 145, states: "The law implies malice in cases of homicide if the killing alone is shown, but, if the circumstances attending the homicide are fully testified to by eye-witnesses, it is error to instruct the jury that there is a presumption of malice from the fact of the killing."

This court said in Flege v. State, 90 Neb. 390, 133 N. W. 431: "If the fact of the killing is established and the circumstances surrounding the killing are not fully shown, so that the jury can judge from the circumstances whether it was intentional, the law will imply legal malice; but, where the circumstances of the killing are all established by evidence or are manifest and not controverted, the law raises no implication as to malice, but leaves that as a fact to be determined by the jury from all of the circumstances surrounding the killing."

Chadek v. State, 138 Neb. 626, 294 N. W. 384, declares: "In a prosecution for murder in the second degree, when the fact of unlawful killing is proved and no evidence tends to show express malice on the one hand or any justification on the other, the law presumes malice. There is an inference that the killing was intentionally done. The crime of murder in the second degree is established, and the evidence requires the submission of the case to the jury." See, also, Kennison v. State, 80 Neb. 688, 115 N. W. 289; Whitehead v. State, 115 Neb. 143, 212 N. W. 35; Tvrz v. State, 154 Neb. 641, 48 N. W. 2d 761; Woodard v. State, *supra;* Wright v. State, *supra.* The instruction challenged by accused was, under the circumstances of this case, properly given to the jury.

It is argued by accused that his conviction is not sustained by the evidence and is contrary to law. It is not claimed that deceased was responsible for the injuries to her body which she suffered while only she

and the accused were in her home and Sarah was out on the street attempting to secure the presence of the police. The facts and circumstances permitted the jury to find that the accused was the only person who could have fatally injured deceased. The accused had quarreled and fought with and abused Sarah. He was intoxicated and when he was stabbed he released Sarah, suddenly turned around, and hit deceased. It was then that Sarah left the house. Shortly thereafter when accused came from the house to the automobile parked in front of it in the street and met Sarah she was told by the accused that: "I fixed her. I stabbed her back * * *," or words having that meaning. Sarah said that accused was then all covered with blood. Deceased in a matter of minutes thereafter was found in the house cut, bruised, the dentures in her mouth broken, one arm fractured, and a knife thrust into her body causing a wound which meant and resulted in certain death. The force to which she was subjected and the severity of the injuries inflicted upon her were indicative of a desire and purpose to destroy the victim and they were far beyond any protection required by accused from any hazard the victim could have been to him. She was a small person of scarcely 100 pounds. Accused was a tall, large, heavy, able-bodied young man trained in the art of boxing and experienced as a fighter of the slugger class. He had fought in and out of the ring. Any contest between them was heavily weighted in favor of the accused. He had no requirement for a butcher knife or the use of it to protect him from any threat to his safety of which she was capable. The choice of the location of the place of the insertion of the knife in the body and the accuracy of the direction of it to a distance that meant inevitable death of the victim were entitled to great consideration by the jury in deciding the purpose and intention of the accused. The jury could have found from the record in this case that the accused maliciously and

purposely killed deceased. In Woodard v. State, *supra,* it is said: "Where the evidence and circumstances of the crime are such that different conclusions may properly be drawn therefrom as to the degree, the trial court is without error in submitting the different degrees to the jury for its determination. See Jackson v. State, 133 Neb. 786, 277 N. W. 92. * * * We said in Fields v. State, 125 Neb. 290, 250 N. W. 63: 'If either Brown or the accused pointed the gun at the deceased, or some other person, and purposely fired the gun, then the intent to kill became specific * * *.' * * * While it is true that the jury did not find such purpose and intent existed, nevertheless, we think the evidence adduced was sufficient to support such a finding if it had been made. It was therefore not only proper but the duty of the trial court to submit the issue of second degree murder." A ·legal reason for interfering with the verdict of the jury has not been presented herein. Vanderheiden v. State, *supra,* states: "In a criminal case, this court will not interfere with a verdict of guilty based upon the evidence, unless it is so lacking in probative force that we can say, as a matter of law, that it is insufficient to support a finding of guilt beyond a reasonable doubt."

The judgment and sentence should be and they are affirmed.

AFFIRMED.