LUTHER WESLEY WILSON, PLAINTIFF IN ERROR, V. STATE OF NEBRASKA, DEFENDANT IN ERROR.

103 N. W. 2d 258

Filed May 27, 1960.   No. 34754.

*Joseph M. Lovely, Edward T. Hayes,* and *Adolph Q. Wolfe,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Cecil S. Brubaker,* for defendant in error.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

Luther Wesley Wilson, plaintiff in error referred to herein as the accused, was charged with and convicted of the crime of murder while in the perpetration of or an attempt to perpetrate a robbery. The sentence was death. He prosecutes this error proceeding to review the record of the trial and his conviction.

Raymond Rasmussen was, in the presence of two eyewitnesses, assassinated by a pistol shot in the right side of his head at about 9:30 p. m., February 28, 1958, while he was on duty in the place of business of his employer in the city of Omaha by a man who was attempting to perpetrate a robbery of the place of business. The accused was charged with the commission of the crime. The place of the tragedy was in a self-serve retail store which sold groceries and liquors located at Thirtieth Street just south of Lake Street in Omaha variously referred to in the record as Aronson's Liquor Market, Aronson's Market, and the Fisher Liquor Store sometimes known as Aronson's. A witness explained it was formerly Aronson's Liquor store but that it was Fisher's Liquor store. It will be identified herein as the market.

The front of the market was to the west on Thirtieth Street and the public or customer entrance thereto was on the west about equidistant from the north and south ends of the building occupied by it. The building was about 24 feet from east to west and about 48 feet from north to south. There was a counter with a cash register on it about 10 feet due east from the entrance to the market and there was a display case immediately adja-

cent to the counter extended from it a distance to the north of 10 feet. Another display case was adjacent to the counter and extended 16 feet from it towards the south. There was a television set on quite a high base facing northwest about 10 feet southeast of the counter. It was operating at the time of the attempted robbery televising a Friday night boxing contest which commenced at 9 p. m., and was then in the seventh round of the contest. Raymond Rasmussen, an employee of the market and the victim of the tragedy, named herein as Rasmussen, was immediately east of the counter and slightly south of the cash register thereon which occupied the center of the counter from north to south and was near the east edge of it. Hugh O'Grady, an employee of the market, hereafter mentioned as O'Grady, was also immediately east of the counter and a short distance north of the cash register. Lester Wells, designated as Wells herein, a lad past 15 years but less than 16 years of age, a student in the ninth grade at Technical High School in Omaha, who was a newspaper carrier and who frequently stopped at the market after he had finished the distribution of papers on his route, was west of but near the counter slightly south of the cash register thereon. He had a comic book which he had been reading and he also was watching the television display of the boxing contest. The two employees above named and Wells were the only persons in the store. The employees were each facing the television and watching the boxing contest thereon and Wells was facing east reading a book when the person who perpetrated the crime entered the market. The area surrounding and the interior of the market were well lighted.

Marvin Dilwood, hereafter designated Dilwood, 16 years of age, a nephew of accused, went to his house about 1 p. m., on February 28, 1958. The only persons who were there were Dilwood and the accused and they remained there until 7:30 or 8 p. m., when they left and walked north on Twenty-ninth Street to Blondo

Street and about one-half block east on Blondo Street to
the home of a sister of the accused, a distance of about
7 blocks. The accused had a bundle which he carried
under one of his arms and did not take it in the house
of his sister when he and Dilwood entered it. It was
about 8 o'clock when they got there. There were several
persons at the home including Frances Johnson, another
sister of accused; her boy friend, George Battles; and
Grill Jones. They were drinking. Dilwood and accused
left there after about 1 hour or near 9 o'clock. The ac-
cused took with him a bundle. They walked west on
Blondo Street to Twenty-ninth Street and north on the
west side thereof to Erskine Street, a distance of al-
most 3 blocks, and when they were nearly there accused
told Dilwood "in a round-about-way" that he, the ac-
cused, was going to hold up Aronson's. Accused took
off the coat he was wearing, took another coat from the
bundle he had been carrying, and put it on. The coat
he took off he placed in a hedge which surrounded a
house at Twenty-ninth and Erskine Streets. When ac-
cused talked of Aronson's, that he was going to hold it
up and he started to change his coat, Dilwood walked
west across Thirtieth Street, climbed a retaining wall,
and reached a sidewalk on the west side of Thirtieth
Street which served the occupants of houses referred to
as "the Projects." They were one story in height and
faced east. The market, which faced west on Thirtieth
Street, was in front of the sidewalk that served the
projects where Dilwood stood. Dilwood was familiar
with the market and had been there many times prior
to February 28, 1958.

Dilwood saw accused change his coat and hide behind
the wall which extends north and south near Thirtieth
Street. He was standing and Dilwood could see his
arms. Dilwood watched accused for a short time and
then saw him get over the wall and in a crouched-down
position run into the front or entrance door of the mar-
ket. Dilwood heard a noise he described as a "pop like

a pop bottle." Accused ran out of the market south on the east side of Thirtieth Street and then east on Erskine Street. He was in the market only a short time, estimated by Dilwood as not more than 5 or 6 seconds. Dilwood remained where he was until he saw persons coming to the market when he crossed Thirtieth Street to learn what had happened and then he returned to the house of his aunt at 2821 Blondo Street which he and accused had visited and left earlier in the evening. When he got there accused was at that location. There was a party there that night from 7:30 or 8 p. m. until almost 1 a. m. the following morning which was March 1, 1958. It was referred to as a "get-together" and many persons attended, some without invitation. Dilwood remained there only 10 or 15 minutes. He was asked by accused to burn a coat which was on the front porch behind a divan. Dilwood left alone taking a bundle which he found behind the divan on the porch to his home at 3333 Ohio Street where he arrived about 10:30 p. m. He placed the bundle in the basement and a few days later burned it. He found inside the coat a white rubber mask with red on the cheek. It was not home-made. He said he first saw it while he was going home carrying the coat. The mask was burned with the coat. The coat was described as light tan gabardine. When accused entered the market Dilwood said he recognized Lester Wells, whom he had known all his life, standing therein in front of a counter and also one of the clerks employed in the market. When Dilwood saw accused go into the market the night of February 28, 1958, he, Dilwood, was standing near Thirtieth and Erskine Streets by a small tree shown in a picture in evidence. That location was identified as 2414 on Thirtieth Street. The address of the market was 2405 on Thirtieth Street. Dilwood was accordingly a short distance south of the market. He was sure of the identity of the accused as the man he saw and whose actions he described.

O'Grady and Rasmussen were on the evening of Febru-

ary 28, 1958, on duty in the market as clerks. They and Wells were the only persons in the market and they were in the positions relative to the counter on which the cash register was located as detailed above. Wells was facing the counter from the west, reading a comic book. The two clerks were facing the television with their backs to the northwest. O'Grady at approximately 9:30 p. m. noticed the front door open. He turned and faced the door. A man entered wearing a mask and carrying a revolver, sort of waving it, in his right hand about waist high. He came quickly right up to the counter and stated: "Hand over your money. This is a stick-up." Rasmussen had turned toward the west and somewhat to the north. He looked at the intruder and as he demanded the money Rasmussen said: "Are you kidding?" There was a shot and he went down on his hands and knees and came to rest on his stomach with his head towards the south. O'Grady fell to the floor and went north and east on the floor to the stairway which was the facility for passage to and from the basement. He went down the stairway to the basement. Wells got to the stairway and down in the basement preceding O'Grady. They took refuge there until the police came which was only a few minutes later. When O'Grady came from the basement Rasmussen had been removed from the market. O'Grady saw the intruder only a few seconds but he estimated that the intruder was about 6 feet tall, of medium build, wearing a knee-length coat, and had a raspy voice. There was nothing taken from the market so far as O'Grady knew or could determine. The cash register was closed when the hold-upman came and it remained closed after he had gone.

The back of Wells was to the holdupman as he entered the market, and as he came toward the counter he shoved Wells to the south out of his way with his right hand in which he had a gun. He wore a mask which covered his face. Wells heard a shot and saw Rasmussen lean forward and fall east of the counter. The last

Wells saw of the intruder he was standing in the market.

William Wells soon after 9:35 p. m. on February 28, 1958, entered the market, selected what he desired, and put it on the counter where the cash register was located. He saw no one in the market when he entered. He waited for a short time and then said: "Where is everybody around here?" He got no response but he heard a noise on the east side of the counter. He discovered it was Rasmussen attempting to get up from the floor. He was partly successful and attempted to say something to William Wells but he could not understand it. Rasmussen then fell back with his head in a northerly direction. His face was bloody. William Wells called the police by telephone and he stayed in the market until the police arrived.

A member of the police department of Omaha examined the injured man on the floor of the market about 9:40 p. m. The policeman found a hole in the head of the injured man under his right ear from which blood was squirting. He was not dead at that time. The officer thought the injured man had been shot.

A member of the detective bureau of Omaha arrived at the market about 9:45 the evening of the tragedy. He found a man lying east of the service counter on the floor with blood coming from the right side of his face and apparently from a wound just below his right ear. The victim was still breathing. The officer spoke to him but got no response. His eyes were in a fixed position. Near the injured man there were two pools of blood of considerable size. The rescue squad arrived and the man who was Rasmussen was taken by ambulance to the Douglas County Hospital.

An autopsy was performed on the body of Rasmussen by a specialist in pathology. He found a circular wound on the body near the ear lobe just back of the angle of the jaw on the right side. He found there was no evidence of powder burns. He could not from an external examination determine that it was a gunshot wound

but it was his opinion and conclusion that it was an entrance and not an exit wound. He by further examination found that a bullet went into the neck, passed through the general area of the major vessels leading from the chest through the neck into the brain, passed just in back of the lower portion of the throat in a comparable area or to the left side, and ended just inside the angle of the left jawbone. The fact that the blood vessels were interrupted was indicated and established by the fact that there was extensive hemorrhaging and bleeding into virtually all of the surrounding tissues of the neck. He found a compression of the throat region which in effect essentially cut off breathing partially or completely. The lungs showed evidence of hyperinflation—that is, more air in the lungs than normally and this was indicative of air being able to get in but not out of the lungs. It was the opinion of the doctor that the death of the victim, Raymond Rasmussen, was caused by shock associated with hemorrhage and also associated with interference to breathe, that these factors combined to cause death, and that the factors were related to the gunshot wound he had previously described. The doctor recovered from the region of the left side of the neck immediately inside the angle of the jaw a copper-headed metal fragment which he presumed was a bullet. He removed it by incising a portion of the bone at the base of the skull and working the bullet out with his fingers keeping it from any contact with instruments. The doctor found that the gunshot caused extensive bleeding of the spurting type since the blood vessels cut by the bullet were relatively large ones. The victim had blood on the right side of his face, on the back part of his head, the upper part of his back, and on both hands.

The accused on October 24, 1958, admitted in the presence of Donald Knowles, deputy county attorney of Douglas County; John Gallagher, a police officer of Omaha; and Jack M. Fitch, a court reporter for the district court for Douglas County, that he, the accused,

told Donald Knowles when he and accused were the only persons in a room at the police station that the accused did the shooting at Aronson's, that he used a .32, and that he threw it in the water at about the middle of the bridge.

There is evidence that the captain of detectives of the Omaha police department talked with accused October 23, 1958, concerning the attempted Aronson robbery and he told the detective that he, the accused, participated in the crime committed at that location; that he shot Rasmussen; that there were no promises or threats made to the accused at that time; and that what he said was voluntary and of his own volition.

There is much substantial conflict and there are many inconsistencies and contradictions in the evidence in this case. The defense of the accused is not without substantial support. However, these were all matters for the consideration and determination of the jury. This court will not in a case of the character of the present one resolve conflicts in or weigh the evidence or pass upon the credibility of witnesses. It is implicit in a verdict of guilty in such a case that the jury decided all controverted questions of fact unfavorably to the accused and this court will not disturb the verdict if it is based upon evidence unless, as a matter of law, it is insufficient to support a finding of guilt beyond a reasonable doubt. Griffith v. State, 157 Neb. 448, 59 N. W. 2d 701; Starkweather v. State, 167 Neb. 477, 93 N. W. 2d 619; Wright v. State, 169 Neb. 497, 100 N. W. 2d 51; Clown Horse v. State, ante p. 336, 102 N. W. 2d 625.

In Starkweather v. State, supra, this court said: "The credibility of witnesses and the weight of the evidence are for the jury to determine in a criminal case in which the evidence presents an issue of fact as to the guilt or innocence of the accused and the conclusion of the jury may not be disturbed by this court unless it is clearly wrong."

This prosecution is based on section 28-401, R. R. S.

1943, which in part declares: "Whoever shall * * * in the perpetration of or attempt to perpetrate any * * * robbery * * * kill another; * * * every person so offending shall be deemed guilty of murder in the first degree, and upon conviction thereof shall suffer death or shall be imprisoned in the penitentiary during life, in the discretion of the jury." This language constitutes homicide in the perpetration or attempt to perpetrate a robbery, a separate offense, as distinguished from ordinary first-degree murder and in a prosecution for such an offense proof is not required of premeditation and deliberation or a purpose to kill. The turpitude involved in a robbery takes the place of deliberate, premeditated malice and the purpose to kill is conclusively presumed from the criminal intention required for robbery. A homicide while perpetrating or attempting to perpetrate a robbery is murder in the first degree. Garcia v. State, 159 Neb. 571, 68 N. W. 2d 151; Rogers v. State, 141 Neb. 6, 2 N. W. 2d 529; Swartz v. State, 118 Neb. 591, 225 N. W. 766; South v. State, 111 Neb. 383, 196 N. W. 684; Keezer v. State, 90 Neb. 238, 133 N. W. 204; Rhea v. State, 63 Neb. 461, 88 N. W. 789.

Section 28-414, R. R. S. 1943, describes the crime of robbery: "Whoever forcibly, and by violence, or by putting in fear, takes from the person of another any money or personal property, of any value whatever, with the intent to rob or steal, shall be deemed guilty of robbery * * *." It is not essential to constitute the crime of robbery for money or personal property of some value to be taken from the person of the victim. It is sufficient if it is taken from his personal presence or personal protection and custody. The essence of the statute is that the money or property must be in the possession or under the control of the victim and that violence or putting in fear was the means used by the robber to take it. See, Cherpinsky v. State, 122 Neb. 52, 238 N. W. 917; Hill v. State, 42 Neb. 503, 60 N. W. 916. An individual attempts to perpetrate a robbery when he

forcibly by violence or by putting in fear attempts to take from another or from his immediate possession or custody any money or personal property of value with intent to rob or steal.

The accused argues that the testimony of Dilwood should not be believed and that the testimony of Wells, a relative of the accused, must be accepted at face value. Accused asserts because of these conclusions the evidence is so deficient as to fail to sustain the verdict of guilty beyond a reasonable doubt. There is the unchallenged testimony of two persons in the market when Rasmussen was shot that a masked man equipped with a revolver in his hand entered the market; proclaimed he was going to rob it; demanded that money be handed over to him; and in response to an inquiry by Rasmussen if the holdupman was kidding he immediately shot Rasmussen, one of the clerks in the store. This establishes homicide caused during an attempted robbery and hence first-degree murder. There is no evidence to the contrary. The body or substance of the crime, the fact that a crime had been committed without regard to the identity of the person responsible for the crime, was established without contradiction. Accused admitted that he participated in the crime at the market, that he shot Rasmussen, and that he threw the firearm he had in the water about at the center of the bridge. This was a confession. The corpus delicti was established. Reyes v. State, 151 Neb. 636, 38 N. W. 2d 539. In such a situation even an unsupported, extrajudicial admission may be competent and sufficient to establish the connection of the accused with the crime. Wilshusen v. State, 149 Neb. 594, 31 N. W. 2d 544. However, there is more proof which supports the verdict, for instance, a statement of a witness that accused told the witness a few minutes before Rasmussen was shot that he, the accused, was going to rob the market, that witness saw the accused enter the market, that witness heard a report that could have been made by shooting a weapon, that witness

saw the accused run out of the store with something covering his face, and that accused ran down a street in the night away from the market. Soon thereafter that night accused asked the witness to burn the coat in which the witness found a rubber face mask.

The accused could not be identified by Wells as the man who entered the market and shot Rasmussen. He was called by the State as a witness at the trial. He thought the holdupman was taller and heavier than accused and that the voice the witness heard the night of the tragedy was not that of the accused with whom witness had been well acquainted for a number of years. Accused insists that the State should be bound and precluded by the testimony of Wells. The State in redirect examination attempted to impeach Wells by the contents of a statement the State asserts was given by Wells before the trial, but his answers were that he did not remember that he made the statements recited to him by counsel for the State. The defense presented evidence to the effect that Dilwood made statements before the trial in some respects inconsistent with and contradictory of his testimony at the trial. However, these were matters which affected only the quality of the evidence and the credibility of the witnesses and they were matters for the consideration and determination of the jury and not for this court. Evidence tending to show that a person made, before becoming a witness in a case, statements inconsistent with and contrary to his testimony as a witness on the trial thereof, does not dispose of his testimony as to the matters involved. It constitutes a part of the evidence in the case to be weighed and considered in the determination thereof. Proof of contradictory statements of a witness is received not as evidence of the facts declared, unless made against interest by one who is a party to the record, but for the purpose only of aiding the jury in estimating the credibility of the witness. Schluter v. State, 153 Neb. 317, 44 N. W. 2d 588. The record in this case does not permit a conclu-

sion that the proof is insufficient to sustain the verdict.

Accused asserts he was denied due process of law because his alleged confessions were received in evidence at the trial which were obtained respectively on the twelfth and thirteenth days after his arrest, during which time no complaint was filed against him; that he was denied his rights to consult with counsel; and that his counsel was not permitted to contact accused. The evidence that accused admitted to the captain of detectives on October 23, 1958, that he participated in the crime committed at the market and that he shot Rasmussen was offered and admitted in evidence without any objection to its admission. The captain of detectives testified that there were no promises or threats made to or against the accused at that time and that the statements and admissions were made by the accused voluntarily and of his own free will.

Likewise the evidence that accused told a police officer on October 23, 1958, that he, the accused, disposed of the gun he had by throwing it from the Douglas Street Bridge into the Missouri River was without objection admitted at the trial. That statement was a part of the same conversation which the captain of detectives testified accused participated in voluntarily and of his own will and volition on October 23, 1958, and that no promises or threats were made to or against the accused. The accused solicited an opportunity to talk with the deputy county attorney of Douglas County and pursuant thereto there was a conversation between them on October 24, 1958, with no other person present. There was evidence that when that conversation was ended John Gallagher and Jack M. Fitch entered the room and accused then admitted that he had told the deputy county attorney when he and the accused were alone that accused did the shooting at Aronson's, that he used a .32, and that he threw it in the water about the middle of the bridge. There was no objection to the evidence on the ground that it was improperly or

illegally obtained and there could not have been effectively because the information was furnished at a conference solicited by accused and had to satisfy his desire. A motion of accused to strike the evidence concerning admissions made by him as above detailed after the whole evidence of the three witnesses had been concluded was properly denied. All of the evidence within the scope of the motion was not in any event objectionable. The motion was joint as to the evidence of all three witnesses in relation to admissions of accused. It could not properly have been sustained on any theory in the manner it was made. A showing of all that occurred immediately before and at the time of the making of a confession is sufficient foundation for its admission if such proof shows it to have been freely and voluntarily made and excludes the hypothesis of improper inducements and threats. Parker v. State, 164 Neb. 614, 83 N. W. 2d 347; Olney v. State, 169 Neb. 717, 100 N. W. 2d 838. The record in this case satisfies the requirement of the doctrine of those decisions.

The claim of accused that he was not told he had the right to secure the services of a lawyer and that he was not permitted to communicate with anyone from October 11, 1958, until October 24, 1958, is disputed by the record because he had a lawyer before and he was represented by counsel at the preliminary hearing of the charge made against accused and that lawyer saw and consulted with accused on two or three occasions during October 1958. One instance of this was the very day the accused talked with the captain of detectives on October 23, 1958. It is true that on one occasion the lawyer had to wait about half an hour before he could talk with his client but he and the lawyer did consult that day. The record does not show why accused was in custody from October 11, 1958, that he was held without charge, or at what date he became a suspect in the killing of Rasmussen. It was not shown

that accused was excessively or improperly interrogated as to that tragedy or that there was any coercion or force in reference to the accused. The charge of denial of due process of law in the respects specified by accused is wholly unsupported by the record.

Accused complains of the rejection by the trial court of the instruction requested by him which was in substance that it is the law the testimony of an accomplice should be closely scrutinized; and if it appeared to the jury that Marvin Dilwood testified falsely as to material matters concerning issues in the case, then all his uncorroborated testimony should be disregarded. Objection is also made because of the refusal of the trial court to charge the jury, as accused requested in substance, that uncorroborated testimony of a confessed participator of a crime "contradicted under oath by himself, contradicted by other witnesses, and inspired by the hope of immunity from punishment, that another was the instigator or participator in the perpetration of his crime, is insufficient to establish the guilt of the accused beyond a reasonable doubt." The proposed instructions each assumed that Marvin Dilwood was an accomplice or "a confessed participator" in the crime. Evidence is lacking to justify this assumption. There is no showing that he knowingly or with common intent with the principal offender united in the commission of the crime or that he was in any way concerned in, aided, or assisted in the commission of the crime. The evidence is that Dilwood first knew of the intention of the accused to commit a robbery at the market only a few minutes before the crime was attempted which resulted in the death of Rasmussen and upon the first mention of such intention by the accused Dilwood disassociated himself from accused. In 14 Am. Jur., Criminal Law, § 110, p. 841, the following appears: "To constitute one an accomplice he must take some part in the crime, perform some act, or owe some duty to the person in danger that makes it incumbent

on him to prevent the commission of the crime. Mere presence, acquiescence, or silence, in the absence of a duty to act, is not enough, however reprehensible it may be, to constitute one an accomplice. The knowledge that a crime is being or is about to be committed cannot be said to constitute one an accomplice, as may not, also, the concealment of knowledge or the mere failure to inform the officers of the law when one has learned of the commission of a crime." If Dilwood gave false testimony in some respects concerning the issues of the case, this did not, as a matter of law, require the jury to disregard uncorroborated testimony which he gave on any other subject. It only required the jury to weigh his testimony, give it such weight if any as the jury decided it was entitled to receive, and determine the credibility of Dilwood as a witness in the case. Knihal v. State, 150 Neb. 771, 36 N. W. 2d 109, 9 A. L. R. 2d 891; Schluter v. State, *supra.* Evidence is lacking that Dilwood was inspired by hope of immunity from punishment or that he wanted or had reason for immunity from punishment for any wrongful act. Persuasive of absence of error in this regard is that the trial court gave an instruction on the subject of an accomplice which is not contested by accused as incorrect. The court gave him more in this respect than the law required. The refusal of the requested instructions was proper.

Accused argues that the deputy county attorney as prosecutor of the case made improper and prejudicial statements in his argument to the jury because the effect of them was an expression by the prosecutor of his personal opinion that accused was guilty of the crime charged against him and was not a deduction from evidence in the case, but was based on other and additional information obtained by the prosecutor during investigation made by him. The presentation of the case to the jury by the prosecutor was generally a discussion of the evidence produced by the State; what

the State claimed was established by it; an analysis from the standpoint of the State of the testimony produced by accused, the quantity of which was considerable and the quality of which was substantial in support of the principal defense which was an alibi; and immediately following which, in closing, the prosecutor said: "That, Ladies and Gentlemen, is the sort of testimony that they would have you believe, as opposed to eyewitness accounts by Marvin Dilwood, and his admissions to Ernie Brown and admissions to me in front of Jack Fitch. Can you believe them? Ladies and Gentlemen, Raymond Rasmussen didn't have a chance. This bandit—this robber—this murderer first in that door, says, 'This is a stick-up. Give me your money.',—Blooey —he didn't even have a chance to give him that money. He killed him. He didn't have a chance. Ladies and Gentlemen of the Jury, the evidence in this case is overwhelming—much less beyond a reasonable doubt, and Luther Wilson, while attempting to rob, did kill Raymond Rasmussen." The specific part of the quoted statement claimed to have been improper and prejudicial is: "This bandit—this robber—this murderer - - -." It was dramatized and personalized by the prosecutor turning from the jury, taking one or two steps in the direction of the accused; and while facing and pointing to him, the prosecutor spoke the words above quoted. The demonstration and the speaking of the words applied to accused were simultaneous. Counsel for accused made timely objection to the closing remarks of counsel. "He pointed to the Defendant, calling him a murderer and so forth. At this time, the Defendant asks that it be struck. We ask the Court to declare a mistrial. The motion of Counsel towards the Defendant is expressing his opinion." The objection and motions were denied.

The reference to the accused by the prosecutor was immediately following reference to the eyewitness account by Dilwood and the admissions of the commis-

sion of the crime by accused. This was followed by reference to the evidence in the case being overwhelming that accused while attempting to rob did kill Rasmussen. The State had produced substantial evidence that accused entered the market with masked face, revolver in hand, proclaimed he was there to rob the market, and demanded that the money be handed to him. He wounded and killed Rasmussen for no better reason than he asked accused if he was kidding. The accused was identified by an eyewitness as the perpetrator of the crime. There was evidence by different witnesses of the admissions of guilt by the accused. The evidence permitted a reference to the accused as a bandit, robber, and murderer by the counsel for the State based on or as a deduction from the evidence in the case in its presentation to the jury. It is a justifiable conclusion from the record that what the prosecutor said, the basis of the objection by the accused, was not the expression of the prosecutor of a personal opinion based on information other than the evidence but was an estimation by the prosecutor that the evidence established that the accused was the bandit, robber, and murderer who perpetrated the crime which was committed in the market. The doctrine in this state is that it is highly improper and generally prejudicial for a prosecuting attorney in a criminal case to declare to the jury his personal belief as to the guilt of a defendant; but if such belief is given as a deduction from evidence, it is not improper. It was said in Roberts v. State, 145 Neb. 658, 17 N. W. 2d 666: " 'It is highly improper for the prosecuting attorney in a criminal case to declare to the jury his personal belief in defendant's guilt, unless such belief is given as a deduction from the evidence.' Balis v. State, 137 Neb. 835, 291 N. W. 477. * * * Here, the county attorney expressed his belief that the evidence was sufficient to sustain a conviction. We do not find prejudicial error in the remark made." See, also, Reed v. State, 66 Neb.

184, 92 N. W. 321; Olsen v. State, 113 Neb. 69, 201 N. W. 969; Annotation, 50 A. L. R. 2d 766.

It was not, under the circumstances of this case, prejudicial error for the prosecutor in the argument of the case to characterize accused by the words used. In Dobry v. State, 130 Neb. 51, 263 N. W. 681, this court stated: "With reference to the alleged misconduct of the assistant prosecutor in referring to the defendant as a murderer and an assassin, we are of the opinion that it was not prejudicial error under the situation as it existed in this case. The statements hereinbefore quoted followed a general summation of the evidence and are conclusions that could readily be inferred from the facts. There was no personal belief expressed that the defendant was a murderer or assassin. From the facts previously detailed it was fairly deducible that the defendant was a murderer and assassin. Under such circumstances, the prosecutor may state conclusions which are predicated upon the evidence. This does not mean that such statements may not constitute error if made for purposes of vilification or vituperation." See, also, Lee v. State, 124 Neb. 165, 245 N. W. 445; Grandsinger v. State, 161 Neb. 419, 73 N. W. 2d 632.

The prosecutor in his argument to the jury referred to admissions of the accused made to the prosecutor in front of Jack M. Fitch. Accused argues this was prejudicial to him because it implied he made incriminating statements to the prosecutor during his investigation of the crime committed in the market which were not in evidence and consequently the prosecutor was an unsworn witness. The prosecutor mentioned specifically admissions in front of Jack M. Fitch who testified that accused admitted to the prosecutor that he, the accused, did this shooting at Aronson's, that he used a .32, and that he threw the gun in the water about the middle of the bridge. There was no basis for implication or inference that the prosecutor received any other or different information from the accused. However, this

objection is not available at this time because the record does not show that any objection was taken to that part of the statement of the prosecutor. The objection which was made was limited to the demonstration made by the prosecutor towards accused and the words spoken at the same time which characterized him as a bandit, robber, and murderer. Objection after completion of the trial in such a situation is futile. If there is no objection made in respect to an alleged improper statement of opposing counsel to the jury at the time of the making thereof, there can be no prejudicial error predicated upon the alleged misconduct. It is too late to make an objection in such a situation in the motion for a new trial. Mulder v. State, 152 Neb. 795, 42 N. W. 2d 858; Swartz v. State, *supra;* Carter v. State, 115 Neb. 320, 212 N. W. 614.

The State produced and examined George Battles as a rebuttal witness. He said he was at the home of Mrs. Givehand, a sister of accused, on Blondo Street February 28, 1958, attending a party commencing about 7 p. m. and continuing practically the whole night. He and accused played a card game called Tonk and later the game was changed to Whist but the witness and accused were engaged in cardplaying practically the whole night. The witness said accused did not leave the party. There is undisputed evidence in the record that the party ended near 1 a. m. in the morning on March 1, 1958. The witness was asked if he had made a statement to the county attorney before the trial. He admitted that he had but did not remember the date of it. The State without more foundation attempted to examine the witness concerning alleged matters in the statement inconsisent with the testimony he had given. Accused objected that the State was attempting to impeach its witness and that there was no showing that the State was surprised or that the witness was hostile to it. The matter was considered without the presence of the jury. The witness testified that he

talked with the prosecutor at the office of the county attorney before testifying at the trial and he then told the prosecutor when they were reviewing the questions contained in the statement that he "never said some of them statements" and that there were some things which the witness did say when the statement was given that "weren't in the statement." The witness also testified that before he was called as a witness at the trial he told the prosecutor at his office that the witness gave the accused $10, he gave the $10 to Elnora, she went and got the liquor, and accused did not leave the house. The objection was overruled and the witness was asked if he had stated the matters contained in the alleged contradictory statement given the prosecutor prior to the trial. The witness admitted some of them, denied others, and disclaimed remembrance as to certain of the questions and answers contained in the statement. The State then produced evidence that the witness by his previous statement given the prosecutor had said that he asked him (accused) if he was going to get the whiskey and Luther (the accused) got up and left; that that was about 9 p. m. (February 28, 1958, the night of the party); that Dilwood was then at the party when accused left; and that Dilwood left the party before the accused came back.

The evidence is not disputed that the county attorney was told before the witness was called to testify that at the party he gave money to the accused to secure whiskey, that accused gave it to his sister Elnora, that she got the whiskey, and that accused did not leave the house. Neither is it disputed that the witness in effect repudiated the contradictory statement by telling the county attorney it was not correct in that it contained things the witness did not say and it failed to contain things that he did say. It affirmatively appears that the prosecutor was not surprised or misled by the statement and he was bound to know in the circumstances that if George Battles were made a witness he would say that

accused did not leave the home of his sister the evening or night of the party until it ended early the following morning. The only significant conflict between the testimony of George Battles and the statement he gave the prosecutor was that in the former the witness said accused did not leave the house of his sister during the party on the night of the crime until the party ended and in the latter the witness said accused left and went to get whiskey about 9 p.m. that evening. A witness may, subject to conditions and limitations, be impeached by the party calling him by showing that he made a statement out of court contrary to one made in court concerning a matter relative to a fact in issue. This doctrine was adopted in this state in Penhansky v. Drake Realty Construction Co., 109 Neb. 120, 190 N. W. 265, by this language: "Where one has been misled or entrapped into calling a witness by reason of such witness, previous to the trial, having made statements to the party, or his counsel, favorable to the party's contention, and at variance with the testimony given at the trial, and the party believed and relied upon such statements in calling the witness, and is surprised by the testimony on a material point, he may, in the discretion of the court, be permitted to show the contradictory statements made before the trial." The statement from that case quoted above was recited in Blochowitz v. Blochowitz, 122 Neb. 385, 240 N. W. 586, 82 A. L. R. 949, and the opinion then made these remarks: "But in the instant case the plaintiffs, in the light of the facts fully known to them when they called this witness to the stand during the trial here under review, could not have been 'misled' or 'entrapped' by the statements appearing in the first deposition, in view of his subsequent testimony in the county court. It is incredible that they, then, in any manner relied thereon or were deceived by the testimony in this case actually given, and that they were actually 'surprised' thereby is a conclusion wholly unsupported by the record and

inconsistent with common sense. The prerequisites to invoking the application of the rule quoted were wholly absent, and the trial court therefore, it is considered, erred in failing to sustain objections seasonably made to this line of examination pursued by plaintiffs, who are in turn under the facts in this case bound by the evidence elicited by them, otherwise uncontradicted, unmodified by the evidence thus erroneously received."

The attempt of the State to impeach its rebuttal witness should have been refused by the trial court. Its failure in this regard was error. This is not to say, however, that the error was prejudicial to accused under the circumstances. George Battles testified as a witness for the State that accused was at the home of his sister at a party from as early as 7 p. m. during practically the whole night and that he did not leave there during that period. In that respect the testimony of the witness was favorable to the accused and was corroborated by several persons who attended the party and testified positively to the same fact. The impeaching testimony did not controvert, eliminate, or destroy the testimony of the rebuttal witness. It was not substantive evidence of the facts declared therein and was only received to aid the jury in estimating the character and credibility of the witness. Schluter v. State, *supra*. The district court by instruction limited the purpose of the impeaching evidence in accordance with that doctrine and it must be assumed that the jury observed the mandate of that instruction. The error in this respect was not legally prejudicial to accused.

A complaint is made that accused was prejudiced by the jury basing the sentence imposed on the false assumption that a parole is too easy to secure. This was presented by a motion for a new trial and a showing intended to support it or at least to originate an inquiry. The duty of a jury in a case of this character is to ascertain the guilt or innocence of the accused; and if its verdict is guilty, to determine the penalty as the law

provides. The decision of the jury should not be influenced by or rest upon the fact of whether a parole, pardon, or other clemency is easy or difficult to secure. Griffith v. State, *supra*. There is no competent showing of any violation of this doctrine in this case.

The judgment and sentence should be and each is affirmed. It should be and is adjudged that the sentence and judgment of the district court for Douglas County rendered and entered in this case be executed on Friday, the 23rd day of September 1960.

AFFIRMED.