**Luther Wesley WILSON, Petitioner,**

v.

**Maurice SIGLER, Warden, Respondent.**

**Civ. No. 1209L.**

United States District Court,
D. Nebraska.

Jan. 13, 1971.

Ronald E. Reagan, Bellevue, Neb., for petitioner.

M. K. Kammerlohr, Asst. Atty. Gen., State of Nebraska, Lincoln, Neb., for respondent.

## MEMORANDUM

VAN PELT, Senior District Judge.

Petitioner, Luther Wesley Wilson, was convicted by a jury of murder while in the perpetration of, or attempting to perpetrate, a robbery which occurred on February 28, 1958, and was sentenced to death. The conviction and sentence were affirmed on appeal to the Nebraska Supreme Court, Wilson v. State, 170 Neb. 494, 103 N.W.2d 258 (1960), cert. denied, 364 U.S. 887, 81 S.Ct. 178, 5 L.Ed.2d 108 (1960). Thereafter, petitioner was granted leave to file a petition for habeas corpus in forma pauperis in this court, and an order to show cause was issued and response thereto was duly made. After satisfying itself that no error had been made in the state court proceeding, this court denied petitioner's application, refused to issue a certificate of probable cause, and overruled his motion for a stay of execution. Petitioner then challenged this court's denial of a certificate of probable cause in the Court of Appeals for the Eighth Circuit, which court overruled his challenge and denied his motion for a stay of execution. Wilson v. Sigler, 285 F.2d 372 (8th Cir. 1961).[1]

Subsequently, petitioner filed a second petition for habeas corpus relief in this court, which was dismissed on the ground that petitioner had not exhausted his state court remedies.[2] A motion to vacate was filed in Douglas County District Court which was denied without reaching the merits of the complaint on April 11, 1966. Petitioner's appointed counsel failed to lodge a timely appeal from this denial, and thus the appeal was never perfected. Petitioner then filed another application for a writ of habeas corpus in this court on March 23, 1967. A hearing was held and an order was entered on June 9, 1968, rejecting petitioner's contentions in three respects, and overruling the petition except insofar as it related to the admissibility of statements made by petitioner and introduced into evidence. Further action was ordered stayed pending application to the state courts to conduct a hearing to determine the voluntariness of these statements, in compliance with Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Petitioner then filed a motion to vacate and set aside his sentence in Douglas County District Court, and on July 9, 1969, an order was entered denying his motion. On August 12, 1969, petitioner inquired of the clerk of that court as to the status of his appeal, and was informed on September 9, 1969, that no appeal had ever been lodged. Petitioner then filed a motion in this court for modification of the court's earlier order denying the application for writ of habeas corpus. A hearing was held in this court and stipulations were filed. Briefs have been submitted and the matter now stands ready for adjudication.

The court is satisfied that petitioner has exhausted his state court remedies, and therefore the only issue for decision is whether the statements allegedly made by petitioner and introduced into evidence through the testimony of police officers and the court reporter were voluntary.[3]

The admissions allegedly made by petitioner during interrogation were in-

1. Petitioner's death sentence was subsequently commuted to life.

2. The second petition was filed after the passage of the Nebraska Post Conviction Act, Neb.Rev.Stat. §§ 29–3001–3004 (Supp.1969).

3. The facts in this case are involved and complicated. They are set out fully in the opinion of the Nebraska Supreme Court on the original appeal, Wilson v. State, 170 Neb. 494, 103 N.W.2d 258 (1960), cert. denied, 364 U.S. 887, 81 S.Ct. 178, 5 L.Ed.2d 108 (1960).

troduced at the original trial through the testimony of police officers Ernest J. Brown and John B. Gallagher, and court reporter, Jack M. Fitch. Officer Brown testified he interrogated petitioner on October 23, 1958, concerning the Aronson murder,[4] and that petitioner told him he shot the deceased. No promises of any kind, nor any threats, were ever made to petitioner. Officer Brown testified that in his opinion the statements were completely voluntary. He did not know whether anyone else had questioned petitioner at this time concerning the murder, but he did know that petitioner had been in custody for a considerable period. Petitioner's lawyer was not present during the interrogation, and no opportunity was given to petitioner to call his attorney.

Officer Gallagher testified he was present during part of Officer Brown's interrogation, but petitioner never admitted the shooting in his presence. Petitioner did admit to him, however, that he threw the gun he used into the Missouri River off the Douglas Street bridge. In Officer Gallagher's presence, the county attorney asked petitioner the next day whether petitioner had earlier stated to him that he had committed the Aronson murder, to which petitioner responded in the affirmative. At no time while he was present during the questioning was petitioner's counsel present, nor was petitioner advised of his right to remain silent. No threats or promises were ever made to petitioner.

Jack Fitch testified he had accompanied the county attorney to see petitioner on October 24, 1958, and took shorthand notes. The notes revealed that petitioner had sent for the county attorney, and that he refused to talk in front of Fitch and Officer Gallagher. The two men then left the room for about 20–30 minutes, and Fitch resumed taking notes when the two men returned. He was stopped by the county attorney at the petitioner's request. While in his presence, the county attorney asked petitioner whether he had just stated to him that he committed the Aronson murder, and petitioner responded that he had. Petitioner also admitted having thrown the gun, a .32 caliber revolver, into the Missouri River. Petitioner's counsel was not present at this time, and Fitch could not recall that petitioner was advised of his right to remain silent. No threats or promises were ever made to petitioner.

Defense counsel did not object to the introduction of this testimony when it was introduced. However, at the conclusion of the testimony of Brown, Gallagher, and Fitch, counsel moved to strike their testimony on the ground that there was no evidence showing the confessions were given voluntarily by the petitioner, and that there was no showing made whatsoever that petitioner was advised of his constitutional rights. The motion was overruled. At that point Officer Gallagher was recalled by the county attorney and testified that the first time petitioner was ever questioned about the Aronson murder was on October 23, 1958, when he made the first damaging statement.

It is axiomatic that the admissions introduced through the testimony summarized above constituted a confession. Ashcraft v. Tennessee, 327 U.S. 274, 66 S.Ct. 544, 90 L.Ed. 667 (1946); Hizel v. Sigler, 430 F.2d 1398 (8th Cir. 1970); Reizenstein v. Sigler, 428 F.2d 702 (8th Cir. 1970). Since the dates here in question predate the decisions in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964),[5] the procedures announced therein to safeguard the Fifth Amendment privilege against self-incrimination during in-custody interrogation are not applicable, as

---

4. The attempted robbery occurred at Aronson's Liquor Store. The name of the deceased was Rasmussen. For convenience, the event will be referred to as the Aronson murder.

5. The factual similarities of this case to the facts in *Escobedo* are discussed *infra*.

neither *Miranda* nor *Escobedo* are to be applied retroactively. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). The court must determine whether the confessions given were given voluntarily, or whether they were the result of overbearing activities by police interrogators. Under pre-*Miranda* law the voluntariness must be analyzed in light of the totality of the circumstances surrounding their elicitation. See Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); Hizel v. Sigler, 430 F.2d 1398 (8th Cir. 1970); Reizenstein v. Sigler, 428 F.2d 702 (8th Cir. 1970). It is no longer open to question that unless a confession is the product of a rational intellect and free will, it is not admissible in evidence. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961).

▮▮▮ Petitioner's claim that his oral statements were taken under circumstances which violate the standards of voluntariness under the due process clause is essentially based on the following factors which, it is argued, demonstrate that his will was overborne by the police tactics:

1– Petitioner was held incommunicado for a period of approximately 10 days to two weeks prior to the time the statements were allegedly made;

2– Petitioner was subjected to frequent, prolonged periods of interrogation while in custody;

3– Petitioner was denied permission to consult with counsel retained for him by his family, despite repeated requests to see counsel;

4– Petitioner suffers from a stomach ulcer, and while incarcerated was deprived of all medication he had been taking for that condition until he allegedly made the damaging statements;

5– Petitioner was never advised of his right to have counsel present during interrogation, and on one occasion his counsel was denied access to the room in which petitioner was being interrogated;

6– Petitioner was never advised he had a right to remain silent and that he did not have to say anything by the interrogating officials.

Each of these allegations must be analyzed in conjunction with each other, and in conjunction with other subjective factors,[6] in order to properly determine their cumulative impact on petitoner's mind at the time of their elicitation. *See, e. g.,* United States ex rel Brown v. Rundle, 311 F.Supp. 1095 (E.D.Pa. 1970). The ultimate question to be answered is "whether the statement[s] as offered to the jury [represent] the product of a 'rational intellect and a free will.'" Reizenstein v. Sigler, *supra,* 428 F.2d at 708 (citations omitted). The court must bear in mind that the state has the same evidentiary burden in post conviction proceedings as it does at trial in establishing that the statements were voluntary.

Petitioner was approximately thirty years old at the time he was convicted, and had a ninth grade education. He was implicated in the Bluva Bar robbery on October 11, 1958, by Frank Jones, and was arrested on that date. Petitioner testified he was never told why he was arrested, nor was he ever advised of his rights. On October 14, 1958, he was charged with the robbery of the Bluva Bar. His family retained David Lathrop to represent him on this charge. From the facts developed at the

---

6. Other relevant factors to be considered are age, intelligence, education, background, atmosphere in which the individual was interrogated, the demeanor of the interrogation, length of time of incarceration prior to interrogation, presence or absence of warnings, physical treatment, promises, or any other inducements made to the individual. *See* Melton v. Patterson, 313 F.Supp. 1287 (D.Colo. 1970); Burton v. Cox, 312 F.Supp. 264 (W.D.Va.1970); Taylor v. Warden, 307 F.Supp. 1192 (D.Md.1969).

original trial, the habeas corpus hearing in this court, and the Jackson v. Denno hearing, it appears that petitioner was not held incommunicado as he has charged, and therefore this factor should be discarded when scrutinizing the circumstances accompanying the elicitation of his admissions. The testimony indicates that Mr. Lathrop saw petitioner on at least three occasions prior to the elicitation of any admissions, and on each occasion advised petitioner not to say anything. Petitioner's girl friend saw him on one occasion, but the time of this visit is not fixed. There is no indication in the record that anyone else even tried to see petitioner.

Petitioner's own testimony contradicts the allegation that he was subjected to prolonged periods of interrogation. The periods of interrogation were described as relatively short, and not the grueling, harassing kind of interrogations petitioner would have the court believe.

Officer Gallagher testified that the first time petitioner was questioned about the Aronson murder was on October 23, 1958. He had been charged with a separate robbery nine days earlier, and evidently was questioned intermittently in regard to this offense. A statement taken from Frank Jones on October 11, 1958, discloses that Marvin Dillwood, petitioner's nephew and one of the State's chief witnesses, had told Jones of his (Dillwood's) participation in the Bluva Bar robbery, a robbery of a grocery store, and the Aronson murder. This statement also reflects the participation of petitioner in each of these three events, and indicates that Dillwood had not actually participated in the murder, but had driven the car in the Bluva Bar robbery.

From two statements by Dillwood, police learned of his participation in, and the detail of, the Bluva Bar robbery. These statements were taken on October 21, 1958. They also learned of petitioner's participation in the robbery, and more specifically learned of his commission of the Aronson murder. This evidence demonstrates that there was reason to believe that defendant carried out the Bluva Bar robbery, the offense with which he was first charged, and also demonstrates that it was not until later that he was fully implicated in the Aronson murder. Thus the charge that petitioner was frequently subjected to prolonged periods of interrogation relating to the murder must be discounted.

■ Essentially the tainted circumstances remaining may be reduced to three specific allegations: (1) petitioner was never advised of his right to counsel or his right to remain silent by the police; (2) petitioner was not allowed to consult with his counsel on one occasion during which he allegedly made an incriminating admission;[7] (3) petitioner was allegedly deprived of his ulcer medication, during the period of incarceration.

---

7. Mr. Lathrop, petitioner's retained counsel, testified that he had visited with petitioner on at least two occasions prior to the interrogations testified to by Officers Brown and Gallagher, and on each occasion advised petitioner not to say anything. He further testified that he attempted to see petitioner on or near October 23, but was informed by the police officers that he would have to wait because petitioner was being interrogated. After waiting approximately twenty minutes, Mr. Lathrop went down the hall and passed the room where petitioner was being interrogated. He attempted to get into the room but was denied admission because the police were interrogating the petitioner. Lathrop shouted through the door, "Luther, it's me, your attorney, don't say anything," and continued to make a great deal of commotion outside of the door so that petitioner would know he was there. Mr. Lathrop was forced to wait about fifteen more minutes, during which time he testified he heard Officer Brown saying to petitioner, "But you did it, didn't you Luther?" Mr. Lathrop did not know whether the county attorney was aware that he was petitioner's counsel, but testified that the police knew. He subsequently discovered there had been a "fruitful" interrogation of petitioner, but was unable to say whether it occurred on the date he attempted to see him and was temporarily refused admission to the room.

Had the trial in this case occurred after the decisions in *Miranda* and *Escobedo,* the confessions would not have been admissible against petitioner for failure to comply with the procedural mandates therein established. The evidence discloses that the interrogating officers did not advise petitioner of his right to counsel, or of his right to remain silent. It is established, however, that petitioner was represented by counsel and that he was at least twice advised by counsel not to say anything. While the fact that he was never advised of his rights by the police gives added weight to the other circumstances described, Davis v. North Carolina, 384 U.S. 737, 739, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), the fact that during the critical period between arrest and confession petitioner had the opportunity to consult with, and receive advice from, counsel goes a long way in eliminating any spectre of coercion surrounding his confession. Allen v. Cupp, 426 F.2d 756 (9th Cir. 1970). The court therefore concludes that this fact must, to a considerable degree, be discounted, and given less weight and consideration than would otherwise be the case in considering the totality of the circumstances.

The factual circumstances of this case relevant to petitioner's claim, are strikingly similar to those in *Escobedo.* In that case defendant was being questioned by the police. His lawyer was not admitted to see him because, he was told, the officers had not completed their interrogation. Counsel waved to defendant, made other motions to him, and at one point yelled to him not to say anything. The testimony indicated that defendant did not know what the gestures meant, nor could he understand what his attorney had yelled. He took it, however, to mean that he was not to say anything.

In the case at bar, petitioner's attorney testified he tried to get in to see petitioner on one occasion but was refused admission because, he was told, the police were interrogating his client. He yelled at petitioner not to say anything and made a good deal of noise so petitioner would know he was there. Petitioner testified he heard his attorney, and understood what he said. This was the third occasion that counsel saw petitioner and the third time he had told him not to say anything.

The precise argument raised in *Escobedo,* that refusal to honor defendant's request to see his attorney during the course of interrogation denied him his Sixth Amendment rights, thereby rendering any incriminating statements elicited inadmissible, is not raised by petitioner, and properly so since it is not applicable to this case. The argument is instead raised that denial of the opportunity to consult with counsel, when viewed in the totality of the circumstances, demonstrates that petitioner's will was overborne.

The court in no manner should be understood to approve of such tactics as were employed in this case in interrogating petitioner. Nevertheless, the court concludes that the circumstances of this one instance were not such gross violations of petitioner's rights as to justify the invocation of the habeas corpus remedy. Petitioner had earlier been advised by counsel on two occasions not to say anything, and so understood his counsel on this third occasion. Yet, petitioner proceeded to fully implicate himself in the murder, and confess to the shooting and disposition of the weapon. No physical force or coercion was used, no threats or promises were made, nor was petitioner tricked in any way.

In *Escobedo,* the Court said:

"[A] system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." 378 U.S. at 488–489, 84 S.Ct. at 1764.

Because *Escobedo* does not have retroactive application, this perfunctory statement is not dispositive of the instant case. Nevertheless, the court considers the statement an appropriate mandate for civilized law enforcement. The tactics employed here were obtrusive and unnecessary and are to be wholeheartedly discouraged.

Giving consideration to this factor with the others remaining does not, however, render the statements involuntary and inadmissible. As earlier stated, the allegation that petitioner was never advised of his rights must be somewhat discounted because of the intervening advice from counsel. The only other allegation to be considered is that petitioner was deprived of his ulcer medication. Predictably, the testimony on this point is in conflict. Petitioner testified he was deprived of his medication and was told he could have it only when he talked to the county attorney. When he called for the county attorney he asked to have his medicine. The county attorney testified that petitioner never said anything about obtaining any medicine for him, although petitioner may have stated he didn't feel well.

Assuming for the purpose of argument that petitioner's allegation is true, the court concludes the totality of the circumstances were not such as to render the statements made involuntary. An examination of several cases decided by the United States Supreme Court holding the confessions involuntary discloses that the circumstances in each of those cases were much more severe than those present in the instant case.

In Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967), defendant was arrested at 6:00 A.M. on Sunday morning and was held and interrogated for the next 38 hours before he was taken before a magistrate. He was given little food and sleep, was constantly questioned by the police, and eventually confessed. He was not informed of his rights even when taken before the magistrate. For the next week he was transferred from prison to prison, questioned without counsel, subjected to lie detector tests, given little food, allowed to sleep only rarely, held incommunicado, and finally confessed for a second time. Although he was ill he was denied treatment and medication. A third confession was elicited a few days later, without any misconduct, but the Court held all three confessions were constitutionally involuntary.

In Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968), defendant was taken into custody at 10:45 P.M. and questioned until midnight. He was not advised of his rights, not given counsel, denied food, denied medication for his high blood pressure, and not given much sleep. The next day he finally confessed, and stated he did so only because he knew the police wouldn't let up until he did. The Court again concluded that the statements made by defendant were involuntary and hence constitutionally inadmissible.

In Davis v. North Carolina, *supra*, defendant, an impoverished Negro of low mentality with a third or fourth grade education, was taken into custody in connection with a rape-murder investigation, and kept in a detention cell for sixteen days. He spoke to no one other than police during this period. He was constantly interrogated about the murder, and was never advised of his rights. An arrest sheet giving various statistics concerning defendant contained a directive not to allow anyone to see defendant, or allow him to use the telephone.[8]

8. The Court placed considerable reliance on this fact in concluding that the statements were involuntary: "Even accepting that police would have allowed a person to see Davis had anyone actually come, the directive stands unassailably as an indicium of the purpose of the police in holding Davis. * * * 'The instruction * * * [demonstrates] that it was the determination of his custodians to keep

Defendant was fed only two dry sandwiches twice a day, along with some peanuts and some other "stuff." To combat his alibis, the police took defendant to the places where he allegedly stole incriminating articles. The police also drove him to the scene of the murder to test his reaction. Finally, on the sixteenth day, defendant confessed. The Court held the confession involuntary, and thus constitutionally inadmissible in evidence.

It is readily apparent that the circumstances in these cases are much more severe than those in the case at bar, even giving petitioner's allegation that he was deprived of his ulcer medicine full evidentiary value. As such the court concludes the totality of the circumstances does not mandate the conclusion that the confessions were constitutionally inadmissible in this case.

It is appropriate to observe that the evidence in this case overwhelmingly convinces the court of petitioner's guilt. The testimony of Marvin Dillwood is but one example of such evidence which absolutely fixes petitioner as the man who committed the murder. Even without the admissions the case against petitioner was so strong that the jury could not have concluded otherwise than that petitioner was guilty as charged.[9]

For the reasons stated, petitioner's motion will be overruled and his requested relief denied. A separate order will be entered in conformity with this opinion.

---

him under absolute control where they could subject him to questioning at will in the manner and to the extent they saw fit, until he would confess.' * * * Moreover, the uncontested fact that *no one* other than the police spoke to Davis during the 16 days of detention and interrogation that preceded his confessions is significant in the determination of voluntariness." 384 U.S. at 745–746, 86 S.Ct. at 1766 (citations omitted.)

9. The comments by Judge Henry J. Friendly in his article, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,

38 U.Chi.L.Rev. 142 (1970), although presently not the law, deserve some comment. Judge Friendly argues persuasively that with a few significant exceptions, convictions should be subject to collateral attack only when the prisoner supplements his constitutional plea with a colorable claim of innocence. The argument, and whether it is or should be the law, is, of course, not material to the decision of this case. The court does, however, consider the argument to be soundly based in logic, the Constitution, and the historic purposes of the Great Writ.